UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHARON CALMON-HESS, Individually and as Heir to the Estate of Christopher L. Calmon, | HONORABLE JOSEPH E. IRENAS |
| | CIVIL ACTION NO. 11-03899 (JEI/KMW) |
| Plaintiff, | |
| v. | **OPINION** |
| ROBIN HARMER and THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Defendants. | |

**APPEARANCES:**

DESIMONE LAW OFFICES
JOHN G. DESIMONE, LLC
John G. DeSimone
22 Euclid Street P.O. Box 237
Woodbury, NJ 08096
    Counsel for Plaintiff


HOFFMAN DIMUZIO
Dante B. Parenti, Esq.
John P. Ciocco, Esq.
1739-1753 Delsea Drive
Franklinville, NJ 08322
    Counsel for Defendant Robin Harmer


**IRENAS**, Senior District Judge:

    This action arises from a dispute over the distribution of

proceeds from a life insurance policy under the Servicemembers'

Group Life Insurance Act (SGLIA), 38 U.S.C. §§ 1965-80A, held by

1

decedent, Christopher Calmon.[1]  Plaintiff Sharon Calmon-Hess, the decedent's mother, and Defendant Robin Harmer, the decedent's ex-wife, both claim to be the rightful beneficiary of the life insurance policy.  Both parties have moved for summary judgment. For the reasons stated herein Defendant Harmer's motion will be granted; Plaintiff Calmon-Hess's cross-motion will be denied.

## I.

Christopher Calmon joined the United States Marines Corps on February 11, 2008.  (Ex. A to Def.'s Br. 14:16-19 ("Calmon-Hess Dep.")).  Prior to that, Calmon was in high school in New Jersey. For a large part of his life, Calmon suffered from bipolar disorder.  Between the ages of four to twelve, he was hospitalized ten times for psychiatric treatment.  (*Id.* 8:11-16). He was on various medications for treatment of his mental illness until the age of fourteen.  (*Id.* 10:1-6, 13:15-16).  After he stopped taking medication, he continued to receive treatment once every three months until he enlisted with the Marines.  (*Id.* 13:17-14:2).  Calmon did not start therapy again until October 2009.  (*Id.* 16:5-16;  Ex. D to Def.'s Br. 80:11-12 ("Harmer Dep.")).

---

[1]  Because federal law governs this dispute, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.  *See Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1245-46 (10th Cir. 2001).

When he joined the Marines, Calmon enrolled in a life insurance policy under the SGLIA and designated his mother, Plaintiff Calmon-Hess, as his principal beneficiary. (Ex. B to Def.'s Br.). At that time, Calmon told her that he wanted her to have the proceeds if anything happened to him. (Calmon-Hess Dep. 26:21-23). She remained the principal beneficiary until July 2009.

After completing basic training, Calmon was stationed at Camp LeJeune, North Carolina. (Calmon-Hess Dep. 17:11-15; Harmer Dep. 17:14-16). While on leave in May 2009, Calmon came to New Jersey to visit family and began dating Defendant Harmer. (Harmer Dep. 13:21-22, 16:15-20). The day after their first date, Calmon asked Harmer to go back to Calmon-Hess's house to help him balance his checkbook. (*Id.* 24:8-20). After approximately one month of dating, Calmon proposed to Harmer, (*id.* 19:3-6), and she moved to North Carolina shortly thereafter. (*Id.* 31:5-9). They were married there on July 21, 2009. (Ex. E to Def.'s Br.). At the time, Calmon did not tell his mother that he had married Harmer. When Calmon-Hess found out, she threatened to disown him. (Calmon-Hess Dep. 38:24-39:17).

Three days after Calmon married Harmer, Calmon executed a new Servicemembers' Group Insurance Election and Certificate in which he named Harmer as the principal beneficiary and his natural father and Calmon-Hess as contingent beneficiaries. (Ex.

3

F to Def.'s Br.).  That same day, he completed a dependency application, listing Harmer as his sole beneficiary.  (Ex. G to Def.'s Br.).

While Calmon and Harmer lived together, Calmon was the sole wage earner.  However, Harmer was instrumental in managing their finances and set a budget for them.  (Harmer Dep. 59:22-60:4).  In early October 2009, Calmon took out a loan to buy a car for Harmer to use.  (*Id.* 57:24-58:4).  While Harmer was there, Calmon spent less time with his friends, Ryan Dotson and Brandi Castleberry.  (Ex. K to Def.'s Br. 26:23-27:6 ("Castleberry Dep.")).  Castleberry and Dotson observed that Harmer would become upset when Calmon discussed certain subjects with Castleberry or Dotson, and, at least one time, they saw Harmer smack Calmon.  (*Id.* 18:12-18, 23:20-25; Ex. I to Def.'s Br. 19:18-20 ("Dotson Dep.")).  Castleberry and Dotson also commented that Calmon seemed stressed and depressed on occasion.  (Castleberry Dep. 36:20-37:8; Dotson Dep. 24:7-8).  Calmon continued to perform the duties that the Marines assigned to him during this time.  (Castleberry Dep. 56:12-14; Calmon-Hess Dep. 30:24-31:4).

Harmer left North Carolina for New Jersey in mid-October 2009 when Harmer and Calmon were evicted from their apartment.  (Harmer Dep. 14-17).  She returned to North Carolina on October 31, 2009, and stayed for a few days before returning to New

4

Jersey permanently.  (Harmer 62:8-20).  While Harmer was in North Carolina in October, Calmon attempted suicide.  (Calmon-Hess Dep. 29:13-16; Harmer Dep. 64:10-20; Castleberry Dep. 40:19-41:1). Calmon was hospitalized for one or two weeks following that incident.  (Calmon-Hess Dep. 29:1-6; Castleberry Dep. 41:15-16).

Within a few days of his suicide attempt, Calmon executed another change of beneficiary form, this time naming Harmer as the principal beneficiary with no contingent beneficiaries.  (Ex. H to Def.'s Br.).  He did not make any further changes to his life insurance beneficiary.  Although Dotson told Calmon to remove Harmer as his beneficiary in December 2009 (Dotson Dep. 16:2-14), Calmon took no action to change his policy.

Calmon and Harmer continued to talk after Harmer left North Carolina, although they saw each other only once more in January, 2010.  (*Id.* 67:11-21).  During the course of these conversations, Calmon threatened to take away Harmer's insurance.  (*Id.* 46:1-48:48:2).  He also asked Harmer to come back to North Carolina. Later, when he found out that Harmer was pregnant, Calmon threatened to seek custody of Harmer's child, even though he was not the father, if she did not come back to him.  (*Id.* 72:23-73:22).  After Calmon said that he would seek custody of the child, Harmer filed for divorce.  (*Id.* 72:19-73:22).  The divorce was finalized in March 2011.  Calmon committed suicide on April 3, 2011.  (Ex. L to Def.'s Br.).

In June 2011, Calmon-Hess filed suit against Harmer and the
Prudential Insurance Company of America, the insurer, in the
Superior Court of New Jersey, Gloucester County asserting two
counts:  (1) Calmon's designation of Harmer was invalid because
Calmon was of unsound mind and lacked the capacity to effect a
valid designation, and (2) Calmon and Harmer's divorce revoked
the designation under New Jersey law, making Calmon-Hess the
beneficiary.  Following Harmer's removal of the claim to this
Court, Prudential Insurance deposited life insurance proceeds of
$400,000 with the Court and was dismissed as a defendant.  (Dkt.
No. 8).

Harmer has moved for summary judgment on both counts.  She
first argues that there is no evidence that Calmon was lacked the
mental capacity to change his insurance policy beneficiary
designation.  On the second claim, Harmer argues that the SGLIA
preempts New Jersey law.  Calmon-Hess has filed a cross-motion
for summary judgment.  She counters that Harmer exerted an undue
influence over Calmon and that Calmon-Hess should be granted
summary judgment based on Calmon's intent to change his
beneficiary.

**II.**

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact,

then judgment will be entered in favor of the deserving party in light of the law and undisputed facts.  *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

### III.

### A.

The SGLIA is one of a line of statutes, including the National Service Life Insurance Act (NSLIA) of 1958, 38 U.S.C. §§ 1901-29, that Congress has enacted to provide life insurance to members of the armed forces serving on active duty.  *See Ridgway v. Ridgway*, 454 U.S. 46, 50 (1981).  Because the NSLIA was allowed to lapse after the Korean War, active duty service members in 1965 could not obtain coverage under it.  *Id.* at 50-51.  To correct this problem, Congress enacted the SGLIA, which in large part resembles the NSLIA.  *Id.* at 51.

The SGLIA provides specific guidance on how the proceeds from a policy should be paid.  38 U.S.C. § 1970(a) provides that the proceeds are paid "[f]irst . . . to the beneficiary or beneficiaries as the member . . . may have designated by a writing received prior to death."  If there is no designated beneficiary, the proceeds are paid to the widow or widower, then to the child or children of the service member and to descendants of deceased children.  If none of these are available, then the proceeds are paid to parents and then to the representative of

the insured's estate.  *Id.*  "A change of beneficiary may be made at any time and without the knowledge or consent of the previous beneficiary."  38 C.F.R. § 9.4(b) (2012).

In this case, there is no dispute that Calmon's designated beneficiary at the time of his death was his ex-wife, Harmer. Rather, the issues presented are whether Calmon lacked the mental capacity to change his designated beneficiary and whether Harmer exercised undue influence over Calmon's decision to do so.

The SGLIA is silent on the issue of mental capacity and undue influence.  "[W]hen a question relating to the interpretation and administration of an insurance policy issued under the authority of the servicemen's insurance statute arises that is not answered by the statute itself . . . , the answer is to be supplied by federal common law."  *Prudential Ins. Co. of Am. v. Athmer*, 178 F.3d 473, 475 (7th Cir. 1999) (citations omitted).  In particular, federal law governs the questions of mental capacity and undue influence.  *Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1246 (10th Cir. 2001); *see also Prudential Ins. Co. Of Am. V. Mehlbrech*, 878 F. Supp. 1382, 1386 (D.Or. 1999) (applying federal law to determine whether a decedent lacked the mental capacity to effect a valid change of his SGLIA policy beneficiary); *cf. Athmer*, 178 F.3d at 475 (noting that "the case for using federal law to answer the question of who is to receive the proceeds of the [SGLIA]

insurance policy is compelling"). Where "there is no established federal common law on a given issue, the Court may consult state law, including the law of the forum state, as a guide to fashioning a rule that is consistent with the policies underlying the federal statute in question." *Koenig v. Automatic Data Processing*, 156 F. App'x 461, 468 (3d Cir. 2005) (citing *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 n.9 (3d Cir. 1993)).

### 1.  Lack of Mental Capacity

The Third Circuit has not articulated a federal law standard for determining mental capacity in the insurance context, nor does it appear that there is any widely adopted standard among the federal courts.  At least two district courts have held that under federal law, a person changing his beneficiary must have

> clearness of mind and memory sufficient to know the nature of the property for which he is about to name a beneficiary, the nature of the act he is about to perform, the names and identities of those who are the natural objects of his bounty; his relationship towards them, and the consequences of his act, uninfluenced by any material delusions.

*Taylor v. United States*, 113 F. Supp. 143, 148 (W.D. Ark. 1953); *see also Mehlbrech*, 878 F. Supp. at 1386 (adopting the *Taylor* test).  However, given the sparsity of federal law in this area, it is helpful to examine New Jersey's standard for mental capacity.

In New Jersey, "[t]he test of capacity to make an agreement . . . is, that a man shall have the ability to understand the

nature and effect of the act in which he is engaged, and the business he is transacting." *Wolkoff v. Villane*, 672 A.2d 242, 245 (N.J. Super. Ct. App. Div. 1996) (second alteration in original) (quoting *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r*, 38 N.J.L. 536, 546 (N.J. 1876)) (internal quotation marks omitted).  A decedent's capacity to designate a beneficiary is presumed.  *Rice*, 260 F.3d at 1247-48.

    In this case, Calmon first changed his beneficiary designation on July 24, 2009.  At that time, he made Harmer the principal beneficiary and designated his mother, Calmon-Hess, and his natural father as contingent beneficiaries, with each receiving fifty percent of the proceeds.  (Ex. F to Def.'s Br).  Calmon again changed his designated beneficiaries on October 26, 2009, making Harmer the sole beneficiary of the life insurance policy.  (Ex. H to Def.'s Br).

    While there is evidence that Calmon was suffering from a mental illness from February to December 2009, it is not sufficient to overcome the presumption of mental capacity.  Calmon had a history of mental illness, including bipolar disorder.  (Calmon-Hess Dep. 8:6-23, 15:3-8).  Calmon-Hess noted that Calmon sounded groggy, tired, and incoherent over the phone on several occasions between February and October 2009 and that on some occasions Calmon did not remember those phone calls.  (Calmon-Hess Dep. 27:22-28:14).  Castleberry also stated that

11

Calmon seemed depressed in July and that she thought "his emotions clouded his judgment." (Castleberry Dep. 36:20-37:8). These statements alone do not demonstrate that Calmon did not understand that he was making a change to his life insurance beneficiary.

Indeed, there is ample evidence that shows that Calmon had full knowledge of the nature of his acts. According to Dotson, Calmon "seemed coherent," although "he was under a lot of stress." (Dotson Dep. 24:7-8). Calmon was able to fulfill the duties that the Marines assigned to him during this time period. (Castleberry Dep. 56:12-14; Calmon-Hess Dep. 30:24-31:4). Calmon also told Dotson that he made Harmer his principal beneficiary because "it was just one of the things that you do when you got married," (Dotson Dep. 17:23-24), and told Harmer that he changed the designation "because [she] was his wife." (Harmer Dep. 45:1). Further, Calmon named Harmer as his beneficiary three days after they were married. On the same day, he filed a dependency application listing Harmer as his sole dependent. (Exs. E-G to Def.'s Br). These facts demonstrate that Calmon was aware that he was changing his insurance beneficiary from his mother, Calmon-Hess, to his wife, Harmer.

Calmon's mental health appears to have been more precarious when he made his second beneficiary change. Although the specific date is unclear, it is undisputed that Calmon was

hospitalized after attempting suicide in mid-October.  On October 26, 2009, he once again changed his life insurance designation, this time with Harmer as the sole beneficiary.  (Ex. H to Def.'s Br).  But apart from the proximity to Calmon's suicide attempt, no evidence suggests that Calmon did not understand the nature of his actions.  Further, even if there were sufficient evidence to invalidate the October 26 beneficiary designation, that document is not dispositive.

Because Calmon had the requisite mental capacity when he executed the July 24, 2009 change of beneficiary, the proceeds would still go to Harmer.  The SGLIA is clear that proceeds from SGLIA policies will be paid "[f]irst . . . to the beneficiary or beneficiaries as the member . . . may have designated."  38 U.S.C. § 1970(a).  The insurance election form states that contingent beneficiaries receive the policy proceeds only "[i]f all principal beneficiaries predecease" the insured.  (Ex. G to Def.'s Br).  As Harmer is listed as the principal beneficiary on the July 24, 2009 form and is still alive, she should receive the proceeds under the policy's terms.

## 2.  Undue Influence

As with mental capacity, there is no uniform federal standard for evaluating undue influence in the insurance

context.[2]  Thus, New Jersey law again supplies the definition.
Under New Jersey law, undue influence exists where there has been
"'mental, moral or physical' exertion which has destroyed the
[individual's] 'free agency'" such that he is prevented "from
following the dictates of his own mind and will and accept[s]
instead the domination and influence of another."  *In re Niles*,
823 A.2d 1, 10 (N.J. 2003) (quoting *Haynes v. First Nat'l State
Bank of N.J.*, 432 A.2d 890, 897 (N.J. 1981)).

New Jersey places the burden of proving undue influence on

---

[2] The Tenth Circuit has adopted the following standard,
taken from a Sixth Circuit ERISA decision:

> [U]ndue influence is generally defined as influence that is
> sufficient to overpower volition, destroy free agency, and
> impel the grantor to act against the grantor's inclination
> and free will.  A showing of mere motive or opportunity to
> exert excessive control over another is not enough to make
> out a claim of undue influence; rather, the influence must
> actually be exerted, either prior to or at the time of the
> execution of the relevant document.  Courts have looked at a
> number of factors to determine whether undue influence has
> been exerted in a given case, including the physical and
> mental condition of the benefactor; whether the benefactor
> was given any disinterested advice with respect to the
> disputed transaction; the "unnaturalness" of the gift; the
> beneficiary's role in procuring the benefit and the
> beneficiary's possession of the document conferring the
> benefit; coercive or threatening acts on the part of the
> beneficiary, including efforts to restrict contact between
> the benefactor and his relatives; control of the
> benefactor's financial affairs by the beneficiary; and the
> nature and length of the relationship between the
> beneficiary and the benefactor.

*Rice*, 260 F.3d at 1250 (quoting *Tinsley v. Gen. Motors Corp.*, 227
F.3d 700, 704 (6th Cir. 2000)).  This standard conforms with New
Jersey's definition.

the individual contesting the designation.  But the burden shifts
if that individual raises a presumption of undue influence by
showing that (1) there was a confidential relationship between
the insured and the beneficiary, and (2) there were suspicious
circumstances that require explanation.  *Haynes*, 432 A.2d at 897.

A confidential relationship may be found where "confidence
is naturally inspired, or, in fact, reasonably exists." *Pascale
v. Pascale*, 549 A.2d 782, 789 (N.J. 1988).  Key factors in this
inquiry are whether the parties dealt with each other as equals,
*id.*, and whether the decedent "was in 'a state of dependency and
reliance,' such as receiving assistance with important life and
financial decisions." *Prudential Ins. Co. of Am. v. Giacobbe*,
2009 WL 3644121, at *3 (D.N.J. Oct. 30, 2009) (quoting *In re
Weeks' Estate*, 103 A.2d 43, 45 (N.J. Super. 1954)).

Where there is a confidential relationship, only "slight"
suspicious circumstances are necessary to shift the burden of
proof.  *Haynes*, 432 A.2d at 897.  But when the confidential
relationship in question is between a husband and wife and the
challenged policy designates the spouse as beneficiary, no
presumption of undue influence will arise even where slight
suspicious circumstances exist.  *Gellert v. Livingston*, 73 A.2d
916, 920 (N.J. 1950).

In this case, a reasonable jury could find that there was a
confidential relationship between Calmon and Harmer.  First,

15

Calmon and Harmer were married, which suggests a confidential relationship.  *See, e.g.*, *Gellert*, 73 A.2d at 70; *In re Raynolds' Estate*, 27 A.2d 226, 231 (N.J. Super. 1942).  Second, Harmer appears to have had some control over Calmon's finances, even though Calmon was the sole wage earner.  Before they were married, Calmon asked Harmer to help him balance his checkbook and manage his bank accounts.  (Harmer Dep. 24:15-20, 25:9-10, 26:12-16).  Castleberry and Dotson both testified that Harmer managed Harmer and Calmon's finances and that Calmon had to check with Harmer before spending money on lunch or at stores. (Castleberry Dep. 27:25-29:25; Dotson Dep. 12:18-13:2, 15:10-16, 19:4-7, 21:17-24, 27:12-15).  Harmer herself testified that she set a budget for Calmon, although the extent to which Calmon actually followed Harmer's financial advice is unclear.  (Harmer Dep. 59:22-60:4, 60:18-20).

Third, Castleberry and Dotson both testified that Calmon deferred to Harmer's wishes, stating that Calmon would not socialize as much because Harmer did not want to spend time with other people and that Harmer would reprimand Calmon for discussing certain subjects with Castleberry and Dotson. (Castleberry Dep. 18:12-18, 23:20-25; Dotson Dep. 12:5-10).  Castleberry and Dotson also stated that Harmer smacked Calmon for speaking out of turn.  (Castleberry Dep. 48:1-5; Dotson Dep. 19:18-22).  Based on these statements, a reasonable jury could

16

find that Calmon and Harmer were in a confidential relationship.

Once a confidential relationship has been established, the person challenging the designation must show that there were suspicious circumstances.  Such circumstances are absent here. Calmon-Hess asserts that there were suspicious circumstances based on the following:  Calmon and Harmer married; their marriage occurred after only knowing each other for a few months; Harmer was in charge of Calmon's finances; and Calmon changed his policy beneficiary from Calmon-Hess to Harmer.  (Pl.'s Br. 11-12).  These assertions are not sufficient to create suspicious circumstances, nor do they address the question of suspicious circumstances surrounding the actual change of beneficiary.

Even viewing the evidence in a light most favorable to Calmon-Hess, there is no indication that Harmer pressured Calmon into naming her as the designated beneficiary.  Harmer stated that Calmon initiated the change of beneficiary of his own accord.  (Harmer Dep. 37:11-38:15, 43:6-8).  Calmon also told Dotson that he had made Harmer the beneficiary because it was the natural thing to do after getting married.  (Dotson Dep. 17:21-24).  Although Calmon-Hess testified that Calmon wanted her to receive the life insurance proceeds, that conversation took place in 2008 when Calmon joined the Marines and first had to designate a beneficiary.  (Calmon-Hess Dep. 26:21-23).  She had no other conversations with Calmon about his life insurance policy after

17

that.  *(Id.* 27:4-12).  These statements are the only evidence of
Calmon's intent and motivation in choosing his designated
beneficiary.  Without more, there is nothing to show any
suspicious circumstances here.

Furthermore, even if these circumstances were suspicious,
the marital relationship between Calmon and Harmer negates any
presumption of undue influence.  *Gellert*, 73 A.2d at 920.  Naming
one's wife as beneficiary of a life insurance policy is far from
being an unnatural action.  As noted above, Calmon stated that
"it was just one of the things that you do when you got married."
(Dotson Dep. 17:23-24).  Thus, no presumption of undue influence
arises.

Finally, the fact that Calmon had ample time and opportunity
to remove Harmer as his designated beneficiary after she had
returned to New Jersey cuts against Calmon-Hess's allegation of
undue influence.  *See 4 Couch on Insurance* § 60:73 ("[F]or undue
influence to operate to invalidate a change of beneficiary, it is
necessary that the undue influence continue during the remainder
of the insured's life on the theory that the acquiescence by the
insured in the change of beneficiary after the improper influence
had been removed constitutes a ratification of the change.").
Harmer left Calmon in North Carolina in November 2009 and saw him
only once after that in January 2010.  (Harmer Dep. 67:11-68:2).
Despite Harmer leaving, Calmon never removed Harmer as from his

life insurance policy.  After Harmer had returned to New Jersey,
Calmon discussed the insurance policy with Dotson, who
recommended that Calmon remove Harmer as a designated
beneficiary.  Calmon stated that "he probably should" but did not
want to at the time because "he wasn't sure how he felt about the
whole situation."  (Dotson Dep. 16:2-14).  Looking at the
available facts, no reasonable jury could find that Harmer
exerted undue influence over Calmon or that any such influence
caused him to designate Harmer as his life insurance beneficiary.
Thus, Harmer's motion for summary judgment on this count will be
granted.


### B.

     Calmon-Hess argues that this Court should declare that she
is the rightful beneficiary based on Calmon's alleged intent to
change his designated beneficiary.  She relies on several cases
that arose under the NSLIA, which held that proof of the
insured's intent to change his beneficiary along with an action
toward making that change was sufficient to effect the change.
(Pl.'s Br. 12-14 (citing *Stone v. United States*, 272 F.2d 746,
747-48 (5th Cir. 1959); *United States v Pahmer*, 238 F.2d 431, 433
(2d Cir. 1956); *Roberts v. United States*, 157 F.2d 906, 909 (4th
Cir. 1946))).  In response, Harmer argues that the SGLIA and its
related case law preempt those cases and that, even if the cases

apply, there is no evidence demonstrating any intent or action on Calmon's part.

The Court agrees that the SGLIA and its related cases supersede the cases upon which Calmon-Hess relies. Several circuits have held that Congress, in enacting the SGLIA, clearly intended to prevent courts from allowing donative intent to determine the beneficiary. Rather, Congress expected courts to construe the beneficiary provision strictly. *See, e.g.*, *Coomer v. United States*, 471 F.2d 1, 4-5 (5th Cir. 1973) (holding that a beneficiary change can be effected only through the SGLIA's required procedures to avoid an inquiry into donative intent); *Stribling v. United States*, 419 F.2d 1350, 1352-55 (8th Cir. 1969) (rejecting the contention that Congress intended the "the liberal policy favoring beneficiary changes" under the NSLIA to survive under the SGLIA). Thus, the NSLIA policy does not apply to beneficiary disputes arising under the SGLIA. *See Coomer*, 471 F.2d at 6; *Stribling*, 419 F.2d at 1352-55 .

Several circuits have also held that the SGLIA's beneficiary provisions must be strictly construed because of the difficulty in determining donative intent. *See, e.g.*, *Prudential Ins. Co. v. Perez*, 51 F.3d 197, 198-99 (9th Cir. 1995) (finding that the insured's intent was irrelevant to determining the rightful beneficiary); *Lanier v. Traub*, 934 F.2d 267, 289 (11th Cir. 1991) (holding that the SGLIA beneficiary provisions must be strictly

construed due to "the difficulty involved in reconstructing a serviceman's donative intentions after his death"); *Prudential Ins. Co. of Am. v. Parker*, 840 F.2d 6, 7 (7th Cir. 1988) ("It is so difficult to reconstruct a person's donative intentions after his death that rules relating to bequests have often been strictly construed, and apparently section [1970] is in this tradition."); *Coomer*, 471 F.2d at 6 (same); *cf. Metropolitan Life Ins. Co. v. Manning*, 568 F.2d 922, 926 (2d Cir. 1977) (relying on SGLIA case law to construe nearly identical language in the Federal Employees' Group Insurance Act and holding that donative intent is irrelevant).  In light of this clear authority, even if there were sufficient evidence to show that Calmon intended to change his beneficiary and that he had taken a positive step to do so,[3] this Court could not overrule Calmon's properly executed beneficiary designation.  Because Calmon did not execute a valid change of beneficiary under the statute, his designation of Harmer stands.  Accordingly, Calmon-Hess's crossmotion for summary judgment will be denied.


## C.

In her second claim, Calmon-Hess seeks a declaratory judgment that Harmer's designation is invalid and that Calmon-

---

[3]  In fact, there is little evidence in the record that Calmon intended to change his beneficiary and no evidence at all that he took any step toward doing so.

Hess is the rightful beneficiary.  She brings this claim under N.J. Stat. Ann. § 3B:3-14 and the New Jersey Declaratory Judgments Act, *id.* §§ 2A:16-50 to -62.  Harmer moves for summary judgment on the ground that the SGLIA preempts New Jersey law.

In her complaint, Calmon-Hess indicates that she seeks relief under N.J. Stat. Ann. § 3B:3-14, which addresses the revocation of any revocable "dispositions or appointment of property made by a divorced individual to his former spouse in a governing instrument."  *Id.* § 3B:3-14(1)(a).  However, she has provided no briefing on the merits of this claim, nor has she provided any opposition to Harmer's contention that the SGLIA preempts this provision.

The law is clear that the SGLIA preempts conflicting state law with respect to the beneficiary provision.  In *Ridgway v. Ridgway*, the Supreme Court addressed the question of whether an order issued in a state divorce proceeding could override a beneficiary designation under the SGLIA.  454 U.S. at 48-50.  The Court held that it could not, explaining that there was a strong federal interest in regulating "payments of the proceeds of SGLIA policies."  *Id.* at 57.  Thus, "the controlling provisions of the SGLIA prevail over and displace inconsistent state law."  *Id.* at 60.

N.J. Stat. Ann. § 3B:3-14 revokes a beneficiary designation to a spouse in the case of divorce and, if applied here, would

revoke Harmer's designation as beneficiary.  This law is in
direct conflict with the SGLIA's directive to pay the proceeds to
the designated beneficiary, no matter who that beneficiary may
be.  The SGLIA delineates a preferred beneficiary order in which
to pay out policy proceeds, starting with the insured's
designated beneficiary.  38 U.S.C. § 1970(a).  Further, the
Administrator of Veterans' Affairs regulations provide that
"[a]ny designation of beneficiary . . . will remain in effect
until properly changed by the member."  38 C.F.R. § 9.4(a).  As
the Supreme Court noted, the SGLIA gives servicemembers wide
latitude in choosing their beneficiaries, no matter what the
relationship may be.  *Ridgway*, 454 U.S. at 56.  Applying the New
Jersey law here would work directly against the SGLIA's purpose
of allowing servicemembers to designate their insurance proceeds
freely.  Because the SGLIA controls where there is a conflict
with state law, the life insurance proceeds should be paid to
Calmon's designated beneficiary, Harmer.  Accordingly, summary
judgment will be granted to Harmer.

## IV.

For the foregoing reasons, summary judgment will be granted
to Defendant Robin Harmer with respect to both of Plaintiff
Sharon Calmon-Hess's claims.  Accordingly, Defendant Harmer is
entitled to the $400,000 life insurance policy currently held in

escrow.  An appropriate order accompanies this opinion.


Date:  October 15, 2012


                                    S/ Joseph E. Irenas
                                    _____

                                    **Joseph E. Irenas, S.U.S.D.J.**